Maxon R. Davis
Jeffry M. Foster
DAVIS, HATLEY, HAFFEMAN & TIGHE, P.C.
P.O. Box 2103
Great Falls, MT 59403-2103
Telephone: 406/761-5243
Facsimile: 406/761-4126
max.davis@dhhtlaw.com
jeff.foster@dhhtlaw.com

**FILED**

DEC 3 1 2013

Clerk, U.S. District Court
District Of Montana
Great Falls

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

|  |  |  |
|---|---|---|
| FIRST DATA MERCHANT SERVICES CORPORATION | : | |
| Plaintiff, | : | Cause No. CV-13-110-G.F. BMM |
| v. | : | |
| AMERICA'S CHOICE MERCHANT SERVICES, LLC, BRANDON L. BAKER, DARREN V. BAKER, and VICKY WILLIAMSON, | : | **VERIFIED COMPLAINT** |
| Defendants. | : | |

Plaintiff, First Data Merchant Services Corporation ("First Data"), through

its undersigned counsel, Davis, Hatley, Haffeman & Tighe, P.C. and Fox

Rothschild LLP, hereby files this complaint against defendants, America's Choice

Merchant Services, LLC ("America's Choice"), Brandon L. Baker ("Brandon

Baker"), Darren V. Baker ("Darren Baker") and Vicky Williamson ("Williamson") (America's Choice, Brandon Baker, Darren Baker and Williamson are collectively referred to as "Defendants"), and in support thereof, alleges as follows:

## The Parties

1.     First Data is a corporation organized under the laws of the State of Florida with a principal place of business located at 5565 Glenridge Connector NE, Suite 2000, Atlanta, Georgia 30342.

2.     America's Choice is a limited liability company organized under the laws of the State of Montana with a principal place of business located at 1305 3rd Avenue So, Great Falls, Montana 59405.

3.     Brandon Baker is an adult individual who, upon information and belief, resides at 1316 14th Street S, Great Falls, Montana 59405.

4.     Darren Baker is an adult individual who, upon information and belief, resides at 1840 Scott Street, San Francisco, California 94115.

5.     Vicky Williamson is an adult individual who, upon information and belief, resides in Great Falls, Montana.

## Jurisdiction and Venue

6.     This Court has original jurisdiction over this civil action because, as provided for in 28 U.S.C. § 1332(a)(1), it is between citizens of different states and

2

the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

7.      Venue is proper in this judicial district because, as provided for in 28 U.S.C. § 1391(b)(2), a substantial part of the events or omissions giving rise to First Data's claims occurred in this judicial district.

### Factual Background

8.      First Data is in the business of, among other things, processing credit and debit card transactions for merchants on behalf of card associations, such as VISA and MasterCard, and payment networks, such as American Express and Discover.

9.      First Data markets and sells its credit and debit card processing services to merchants through, among other means, a network of sales agents known as independent sales organizations ("ISOs").

10.     America's Choice is an ISO that, between December 2011 and August 2013, marketed and sold First Data's credit and debit card processing services to merchants.

11.     Brandon Baker is the President and Chief Executive Officer of America's Choice.  Brandon Baker is registered with the Montana Secretary of State as the registered agent for America's Choice.

3

12.     Darren Baker is registered with the Montana Secretary of State as the member of America's Choice.

13.     Williamson is the Vice President of Operations at America's Choice.

### The Marketing Agreement

14.     On or about December 27, 2011, First Data and America's Choice, as well as Wells Fargo Bank, N.A. ("Wells Fargo"), entered into a Marketing Agreement (the "Agreement") for the purpose of giving America's Choice the right, subject to the terms and conditions in the Agreement, to market and sell First Data's credit and debit card processing services to prospective merchant-customers of First Data. A true and correct copy of the Agreement, as amended, is attached hereto as Exhibit A, which copy of the Agreement has been redacted to protect from disclosure First Data's confidential pricing information.

15.     Under the terms of the Agreement, America's Choice agreed to use its best efforts to solicit prospective merchants to sign merchant processing agreements with First Data and Wells Fargo. *See* Agreement at ¶ 2(a). First Data and Wells Fargo are collectively referred to in the Agreement as "Service Providers." *See* Agreement at Recital A.

16.     Except as specifically provided in the Agreement, America's Choice agreed to market and sell to prospective merchants only the credit and debit card processing services offered by First Data. *See* Agreement at ¶ 2(a).

4

17. The Agreement required America's Choice to comply with all "Program Standards," which the Agreement defines, in relevant part, as follows:

> (i) the credit criteria, standards and policies and procedures established by [First Data and Wells Fargo] and provided to [America's Choice] for [America's Choice's] use in connection with the solicitation of prospective Merchants, including Schedule B, which is a list of certain categories of merchants who are always unacceptable under the Program and should not be solicited by ISO for the Program . . . (iii) other policies, procedures, fines and penalties established by [First Data and Wells Fargo] and provided to [America's Choice] in writing that are designed to promote Merchant satisfaction, to preserve relationships with existing Merchants, to facilitate the growth of the Program, and _to ensure the financial safety or soundness of [First Data and Wells Fargo] and their Program_. Program Standards may be established or modified by [First Data and Wells Fargo] from time to time in their sole discretion.

Agreement at ¶ 1 ("Definitions") (emphasis added).

18. The Agreement further required America's Choice to comply fully with "all bylaws, rules, operational regulations, procedures and guidelines promulgated by MasterCard, VISA, Discover or any other Bank Card association or card issuing organization with respect to a transaction card that a Merchant submits a transaction to [First Data and Wells Fargo] for processing under this Agreement." _See_ Agreement at ¶¶ 1, 6.

19. Subject to various conditions, and on a monthly basis, First Data agreed to pay America's Choice residual fees in an amount equal to the "Discount Fee" (a percentage of the dollar amount of each transaction submitted by each merchant who signed a merchant processing agreement with First Data procured

by America's Choice) and any other fees collected by First Data from such merchants less the sum of any applicable processing fees and other fees identified in the Agreement. _See_ Agreement at Schedule A; _see also_ Agreement at ¶ 1 ("Discount Fee").

20.    First Data retained the right to set-off against any residual payments to be made to America's Choice any sums due and owing to First Data, including "the amount of any previously paid fee attributable to any Merchant refund that is made at the request of [America's Choice]." _See_ Agreement at ¶ 9(a).

21.    The Agreement provided that America's Choice would establish and maintain a bank account to which First Data would deposit any amounts owed to America's Choice or from which First Data would collect any amounts owed by America's Choice to First Data. _See_ Agreement at ¶ 11(a)-(b).

22.    In the event that America's Choice's bank account contained insufficient funds to cover any amount due and owing to First Data, America's Choice agreed to "immediately pay such amount" to First Data. _See_ Agreement at ¶ 11(b).

23.    Under the terms of the Agreement, America's Choice agreed that "[a]ll Merchant Applications, Merchant Agreements and Merchant accounts and records shall be and remain the exclusive property of [First Data and Wells Fargo]. [America's Choice] acknowledges and agrees that all Merchant Applications,

Merchant Agreements and Merchant accounts and records are owned by [First Data and Wells Fargo] and may not be transferred, assigned, sold or exchanged by [America's Choice]." *See* Agreement at ¶ 7(c).

24.    In addition to its other obligations under the Agreement, America's Choice agreed not to "divulge or disclose to third parties, without the written consent of [First Data and Wells Fargo], any Confidential Information." *See* Agreement at ¶ 5.

25.    The Agreement defines "Confidential Information" to include, among other items, "pricing information, Merchant Applications, Merchant Agreements, Merchant accounts and records, [and] customer lists . . . ." *See* Agreement at ¶ 1.

26.    The Agreement further provides:

> If a party breaches this Section 5 ("Confidentiality"), the non-breaching party will suffer irreparable harm and the total amount of monetary damages for any injury to such party will be impossible to calculate and therefore an inadequate remedy.  Accordingly, the non-breaching party may (i) seek temporary and permanent injunctive relief against the breaching party or (ii) exercise any other rights and seek any other remedies to which the non-breaching party may be entitled to at law, in equity and under this Agreement for any violation of this Section 5.  The provisions of this Section 5 shall survive the expiration or termination of this Agreement.

Agreement at ¶ 5(c).

27.     On behalf of America's Choice, Brandon Baker confirmed America's Choice's understanding of its confidentiality obligations by initialing Section 5 of the Agreement.

28.     America's Choice further promised that it would not, directly or indirectly, on its own behalf or on behalf of any other person or entity, contact or solicit any merchant that it procured under the Agreement for the purpose of providing processing services (the "Non-Solicitation Obligation"). *See* Agreement at ¶ 2(j).

29.     America's Choice's obligation to comply with the Non-Solicitation Obligation specifically survives any termination of the Agreement. *See* Agreement at ¶ 18(d)(iv).

30.     With respect to termination, the Agreement provides that First Data may terminate the Agreement immediately upon the occurrence of, among other events, "[f]raudulent activity by [America's Choice] . . . ." *See* Agreement at ¶ 18(b)(iii).

31.     Upon a termination of the Agreement for any reason, First Data and Wells Fargo are "responsible for all servicing of Merchants and rendering all services under the Merchant Agreements (including setting Merchant pricing)." *See* Agreement at ¶ 18(d)(ii).

32. Upon a termination of the Agreement as provided for in Section 18(b)(iii), First Data has no further obligation to make residual payments to America's Choice. _See_ Agreement at ¶ 18(d)(iv).

33. Upon an early termination of the Agreement due to a default by America's Choice, the parties agreed that it would be difficult or impossible to ascertain First Data's actual damages.

34. As such, the parties agreed that a reasonable estimation of the actual damages caused by an early termination of the Agreement as a result of a default by America's Choice is an amount equal to the product of "(i) the greater of (1) the Minimum Processing Fee for Contract Month in which Agreement terminates or (2) average Processing Fees per Contract Month for the six Contract Months immediately preceding the Contract Month in which the Agreement terminates, multiplied by (ii) the number of full Contract Months remaining in the then-current Term, multiplied by (iii) 35%. (the "Liquidated Damages")." _See_ Agreement at Schedule A, ¶ 2(b).

35. The parties further agreed that the Liquidated Damages provided for in the Agreement "represent a reasonable and genuine estimate of the actual damages that [First Data and Wells Fargo] would suffer in the event of early termination of this Agreement and does not constitute a penalty." _See_ Agreement at Schedule A, ¶ 2(b).

36.     The Agreement specifically permits First Data to recover from America's Choice, in addition to Liquidated Damages, any amounts for which America's Choice is liable under the Agreement other than for Processing Fees. *See* Agreement at Schedule A, ¶ 2(b).

37.     As provided for in the Agreement, America's Choice agreed to indemnify First Data "from and against any loss, liability, damage, penalty or expense (including attorney's fees and cost of defense) ("Damages") suffered or incurred as a result of (i) any breach of [America's Choice's] obligations under this Agreement (ii) any warranty or representation made by [America's Choice] to [First Data and Wells Fargo] being false or misleading . . . (iv) any failure by [America's Choice] to fully comply with the Rules or any rules, regulations, order and requirements of any regulatory authority, [or] (v) any fraud by [America's Choice] . . . ." *See* Agreement at ¶ 16.

38.     The Agreement is governed by New York law. *See* Agreement at ¶ 33.

### America's Choice Engages In A Scheme To Defraud First Data

39.     At or around the time it signed the Agreement, America's Choice also signed a merchant processing application and agreement to establish its own merchant processing account. An exemplar of the merchant processing application and agreement signed by America's Choice is attached hereto as Exhibit B.

40.     On or about February 6, 2013, America's Choice embarked on a surreptitious campaign to fraudulently obtain funds from First Data by submitting to First Data false refund requests to America's Choice's own merchant processing account.

41.     Specifically, in each instance, Williamson, America's Choice's Vice President of Operations, sent an e-mail to First Data requesting a refund to America's Choice's own merchant account in an amount specified on the "Retail Refund Request Form" attached to each of Williamson's e-mails.

42.     In each instance, Williamson described the refund request as "refund monthly fees."

43.     On their face, the refunds requested by America's Choice appeared to be legitimate and, as such, were processed and approved by First Data.

44.     First Data has since discovered that America's Choice did not actually incur any monthly fees because it did not process credit or debit card transactions and that the refund requests that it submitted were fraudulent.

45.     Based upon First Data's investigation to date, the following table reflects the false and fraudulent refund requests submitted by America's Choice:

| Date | False Refund Amount |
| --- | --- |
| 2/6/13 | $388.85 |
| 2/13/13 | $242.00 |
| 3/4/13 | $400.00 |
| 3/6/13 | $229.75 |
| 3/11/13 | $1,572.62 |

| | |
|---|---|
| 3/12/13 | $89.00 |
| 3/14/13 | $9.95 |
| 4/4/13 | $2,000.00 |
| 4/15/13 | $1,000.00 |
| 4/30/13 | $2,000.00 |
| 5/1/13 | $5,000.00 |
| 5/6/13 | $2,500.00 |
| 5/14/13 | $5,000.00 |
| 5/23/13 | $5,000.00 |
| 5/29/13 | $5,500.00 |
| 5/30/13 | $4,000.00 |
| 6/4/13 | $6,500.00 |
| 6/11/13 | $6,500.00 |
| 6/18/13 | $6,500.00 |
| 6/24/13 | $6,500.00 |
| 7/2/13 | $6,500.00 |
| 7/9/13 | $6,500.00 |
| 7/15/13 | $6,500.00 |
| **TOTAL** | **$80,432.17** |

46.     On or after July 16, 2013, First Data uncovered the fraud perpetrated by America's Choice and promptly took appropriate steps to prevent America's Choice from unlawfully taking any additional money from First Data.

47.     First Data immediately demanded that America's Choice pay back to First Data any and all funds that America's Choice received as part of its fraudulent scheme.

48.     On or about July 23, 2013, America's Choice, through Brandon Baker, acknowledged that America's Choice had requested that First Data credit funds to its merchant account and that America's Choice purportedly used those funds to help grow its business.

49. On behalf of America's Choice, Brandon Baker promised to repay the funds that America's Choice received as part of its fraudulent scheme.

50. Because First Data had a right to set-off the amounts credited to America's Choice merchant account from the monthly residual stream that First Data paid to America's Choice as an ISO, America's Choice purportedly thought "the residuals would catch up to what was credited." *See* Email, dated July 23, 2013, from Brandon Baker to Marty Sass at First Data, attached hereto as Exhibit C.

51. To further protect itself and its merchant-customers, on or about July 24, 2013, First Data shut down America's Choice's access to First Data's systems.

52. Despite First Data's repeated demands that America's Choice pay back the money it wrongfully and fraudulently obtained from First Data, America's Choice has not made any payments to First Data.

53. Before it discovered America's Choice's fraud, First Data withheld from America's Choice's monthly residual stream approximately $17,682.13 as partial payment of the refund monies that America's Choice fraudulently obtained from First Data.

54. $62,750.04 remains due and owing to First Data.

55. Effective August 12, 2013, as provided for in Section 18(b)(iii) of the Agreement, First Data terminated the Agreement as a result of America's Choice's

fraudulent activity. _See_ Letter from Jill Dokson, Esq. to America's Choice, dated August 12, 2013, attached hereto as Exhibit D.

56.    Because First Data terminated the Agreement as a result of a default by America's Choice, as described above, First Data's termination of the Agreement triggered America's Choice's obligation to pay Liquidated Damages.

57.    Based upon the formula agreed to by the parties and set forth in the Agreement, America's Choice owes First Data Liquidated Damages in the amount of $96,600.00 over and above the amounts that America's Choice owes to First Data as result of the fraudulent refunds.

## America's Choice Improperly
## Contacts and Solicits First Data's Merchant-Customers

58.    In its termination letter to America's Choice, First Data reminded America's Choice of its Non-Solicitation Obligation in the Agreement.

59.    On or about October 31, 2013, First Data received written requests to terminate, in the aggregate, thirty-two (32) merchant accounts pertaining to merchants that America's Choice had previously brought to First Data under the Agreement.

60.    As provided in the Agreement, America's Choice is not permitted to contact or solicit any of First Data's merchant-customers, including those merchants that America's Choice brought to First Data.

61.     As provided in the Agreement, First Data owns the relationships with all of the merchants that America's Choice brought to First Data, including the thirty-two (32) merchants that America's Choice improperly contacted, solicited and whose merchant accounts America's Choice improperly and unlawfully attempted to terminate.

62.     If America's Choice is permitted to continue contacting or soliciting First Data's merchant-customers, then America's Choice will continue to be in direct violation of its covenant not to solicit those merchants.

63.     First Data's need for relief is immediate.

## COUNT I
## (Fraud)

64.     First Data incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

65.     As   described   above,   America's   Choice   made   numerous representations to First Data in the form of requests for refunds that America's Choice was not lawfully entitled to receive.

66.     The representations made by America's Choice were material and false.

67.     America's Choice knew that its representations to First Data were false and intended that First Data would rely upon those representations to its detriment.

68.     First Data did not know that America's Choice's representations were false at the time that they were made and did, in fact, rely upon those representations to its detriment.

69.     First Data had a right to rely upon America's Choice's representations.

70.     As a direct and proximate result of America's Choice's representations, First Data has suffered loss and damage.

## COUNT II
### (Breach of Contract)

71.     First Data incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

72.     First Data has fully complied with its obligations under the Agreement.

73.     America's Choice has a duty to comply with its obligations under the Agreement.

74.     America's Choice's failure to pay First Data (i) the balance due and owing of America's Choice's unlawful refund requests, and (ii) Liquidated Damages, respectively, constitutes a material breach of the Agreement.

75.     As a direct and proximate result of America's Choice's material breach of the Agreement, First Data has suffered loss and damage.

16

## COUNT III
### (Unjust Enrichment)

76.   First Data incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

77.   First Data conferred benefits upon America's Choice by refunding to its merchant account approximately $80,432.17 as a result of the refund requests improperly submitted by America's Choice.

78.   America's Choice retained and appreciated the benefits that First Data conferred upon it.

79.   It would be inequitable to allow America's Choice to retain the $62,750.04 that remains due and owing to First Data because America's Choice would otherwise benefit from its wrongful and unlawful actions.

80.   As a direct and proximate result of America's Choice's conduct, First Data has suffered loss and damage.

## COUNT IV
### (Conversion)

81.   First Data incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

82.   First Data is the owner of the money that America's Choice wrongfully obtained as a result of its unlawful refund requests.

83.     First Data has a right of possession over the money that America's Choice wrongfully obtained as a result of its unlawful refund requests.

84.     Despite First Data's repeated demands that America's Choice return the money that it wrongfully obtained from First Data, America's Choice continues to exercise control over First Data's property.

85.     As a direct and proximate result of America's Choice's conduct, First Data has suffered loss and damage.

## COUNT V
### (Breach of Contract)
### (Non-Solicitation Obligation and Confidentiality Restrictions)

86.     First Data incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

87.     The Non-Solicitation Obligation and the confidentiality restrictions in the Agreement are reasonable, binding and enforceable against America's Choice.

88.     America's Choice's acts and omissions, as described above, constitute a breach of the Agreement's Non-Solicitation Obligation and confidentiality restrictions.

89.     First Data has been and continues to be damaged by America's Choice's breach of the Agreement's Non-Solicitation Obligation and confidentiality restrictions.

90.    America's Choice's breaches of the Non-Solicitation Obligation and confidentiality restrictions have caused, and will continue to cause, First Data to suffer irreparable harm for which there exists no adequate remedy at law.

91.    First Data is entitled to preliminary and permanent injunctive relief, as well as specific performance, to prevent further breaches by America's Choice of the Non-Solicitation Obligation and confidentiality restrictions.

## COUNT VI
## (Tortious Interference with Contractual Relations)

92.    First Data incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

93.    First Data entered into valid and enforceable merchant processing agreements with those merchants procured by America's Choice under the Agreement.

94.    As provided in the Agreement, because First Data terminated the Agreement, First Data is now "responsible for all servicing of Merchants and rendering all services under the Merchant Agreements (including setting Merchant pricing." *See* Agreement at ¶ 18(d)(ii).

95.    Moreover, as provided in the Agreement, America's Choice acknowledged and agreed that all Merchant Applications, Merchant Agreements and Merchant accounts and records are owned by First Data and may not be

19

transferred, assigned, sold or exchanged by America's Choice. *See* Agreement at ¶ 7(c).

96. By its conduct as described above, America's Choice has intentionally interfered with First Data's existing contractual relationships with those merchants procured by America's Choice.

97. America's Choice's tortious interference with First Data's contractual relationships with existing merchants was calculated to cause damage to First Data and its business.

98. America's Choice's tortious interference with First Data's contractual relationships with existing merchants was not justified.

99. America's Choice's tortious interference with First Data's contractual relationships with existing merchants has caused First Data to sustain loss and damage.

## COUNT VII
### (Alter Ego Liability)

100. First Data incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

101. At all times relevant to this complaint, Brandon Baker, Darren Baker and Williamson were the principal owners, directors, officers, managers and/or agents of America's Choice.

102.   At all times relevant to this complaint, Brandon Baker, Darren Baker and/or Williamson were responsible for the planning, supervision, direction and operation of America's Choice.

103.   Upon information and belief, Brandon Baker, Darren Baker and/or Williamson are the alter egos of America's Choice.

104.   Upon information and belief, Brandon Baker, Darren Baker and/or Williamson dominate and control America's Choice such that there is a unity of ownership and interest between Brandon Baker, Darren Baker and/or Williamson, on the one hand, and America's Choice, on the other hand.

105.   Upon information and belief, Brandon Baker, Darren Baker and/or Williamson failed to adequately capitalize America's Choice throughout its operations under the Agreement.

106.   Upon information and belief, Brandon Baker, Darren Baker and/or Williamson failed to comply with Montana's statutory requirements regarding the operation of a limited liability company.

107.   Upon information and belief, Brandon Baker, Darren Baker and/or Williamson failed to maintain adequate books and records of America's Choice or observe corporate formalities with respect to America's Choice.

108. Upon information and belief, Brandon Baker, Darren Baker and/or Williamson commingled personal funds with the funds purportedly belonging to America's Choice.

109. Upon information and belief, Brandon Baker, Darren Baker and/or Williamson used America's Choice as a subterfuge to defeat public convenience, justify wrong or perpetrate fraud for the purpose of avoiding liability for the unlawful acts in which they were engaged.

110. Against this factual background, the Court should pierce the corporate veil of America's Choice and hold Brandon Baker, Darren Baker and/or Williamson liable for the acts or omissions of America's Choice.

WHEREFORE, plaintiff, First Data Merchant Services Corporation, demands judgment against defendants, America's Choice Merchant Services, LLC, Brandon Baker, Darren Baker and/or Vicky Williamson and each of their respective officers, directors, managers, agents, servants, employees, attorneys and alter egos, as follows:

      (A)   Ordering specific performance by America's Choice of its obligations under the Non-Solicitation Obligation in the Agreement;

      (B)   Ordering specific performance by Brandon Baker, Darren Baker and/or Vicky Williamson of America's Choice's obligations under the Non-Solicitation Obligation in the Agreement;

      (C)   Preliminarily and permanently enjoining America's Choice for a period of thirty-six (36) months from the date First Data terminated the Agreement from contacting or soliciting, directly or indirectly, on behalf of itself or on behalf of any other person

or entity, any merchant-customers of First Data for processing services;

(D)   Preliminarily and permanently enjoining Brandon Baker, Darren Baker and/or Vicky Williamson from contacting or soliciting, directly or indirectly, on behalf of themselves or on behalf of any other person or entity, any merchant-customers of First Data for processing services;

(E)   Awarding First Data compensatory damages in an amount to be determined at trial, plus interest, costs and fees incurred herein;

(F)   Awarding First Data exemplary damages based upon Defendants' fraud;

(G)   Awarding First Data its attorneys' fees and costs; and

(H)   Awarding First Data such additional relief as the Court may determine to be just and proper.

Dated:  December 31, 2013

Maxon R. Davis
Davis, Hatley, Haffeman, & Tighe, P.C.
101 River Drive North
Milwaukee Station, 3rd Floor
Great Falls, Montana 59401

David H. Colvin, Esquire
(*pro hac vice* requested)
Fox Rothschild LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
(215) 299-2139
(215) 299-2150 (facsimile)
*Attorneys for Plaintiff*
*First Data Merchant Services Corporation*

## **VERIFICATION**

As provided for in 28 U.S.C. § 1746, I, Marty A. Sass, hereby declare that I have reviewed the foregoing complaint and the facts set forth therein are true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

_____
MARTY A. SASS